(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEXMARK INTERNATIONAL, INC. *v.* STATIC CONTROL COMPONENTS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 12–873.   Argued December 3, 2013—Decided March 25, 2014

Petitioner Lexmark sells the only style of toner cartridges that work with the company's laser printers, but "remanufacturers" acquire and refurbish used Lexmark cartridges to sell in competition with Lexmark's own new and refurbished ones.  Lexmark's "Prebate" program gives customers a discount on new cartridges if they agree to return empty cartridges to the company.  Each Prebate cartridge has a microchip that disables the empty cartridge unless Lexmark replaces the chip.  Respondent Static Control, a maker and seller of components for the remanufacture of Lexmark cartridges, developed a microchip that mimicked Lexmark's.  Lexmark sued for copyright infringement, but Static Control counterclaimed, alleging that Lexmark engaged in false or misleading advertising in violation of §43(a) of the Lanham Act, 15 U. S. C. §1125(a), and that its misrepresentations had caused Static Control lost sales and damage to its business reputation.  The District Court held that Static Control lacked "prudential standing" to bring the Lanham Act claim, applying a multifactor balancing test the court attributed to *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519.  In reversing, the Sixth Circuit relied on the Second Circuit's "reasonable interest" test.

*Held*: Static Control has adequately pleaded the elements of a Lanham Act cause of action for false advertising.  Pp. 6–22.

   (a) The question here is whether Static Control falls within the class of plaintiffs that Congress authorized to sue under §1125(a).  To decide that question, this Court must determine the provision's meaning, using traditional principles of statutory interpretation.  It is misleading to label this a "prudential standing" question.  Lexmark

bases its "prudential standing" arguments on *Associated General Contractors,* but that case rested on statutory considerations: The Court sought to "ascertain," as a statutory-interpretation matter, the "scope of the private remedy created by" Congress in §4 of the Clayton Act, and the "class of persons who [could] maintain a private damages action under" that legislatively conferred cause of action, 459 U. S., at 529, 532.  And while this Court may have placed the "zone of interests" test that Static Control relies on under the "prudential" rubric in the past, see, *e.g., Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 12, it does not belong there any more than *Associated General Contractors* does.  Rather, whether a plaintiff comes within the zone of interests requires the Court to determine, using traditional statutory-interpretation tools, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim. See, *e. g., Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 97, and n. 2.  Pp. 6–9.

  (b) The §1125(a) cause of action extends to plaintiffs who fall within the zone of interests protected by that statute and whose injury was proximately caused by a violation of that statute.  Pp. 10–18.

    (1) A statutory cause of action is presumed to extend only to plaintiffs whose interests "fall within the zone of interests protected by the law invoked."  *Allen* v. *Wright*, 468 U. S. 737, 751.  "[T]he breadth of [that] zone . . . varies according to the provisions of law at issue."  *Bennett* v. *Spear*, 520 U. S. 154, 163.  The Lanham Act includes a detailed statement of its purposes, including, as relevant here, "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition,"  15 U. S. C. §1127; and "unfair competition" was understood at common law to be concerned with injuries to business reputation and present and future sales. Thus, to come within the zone of interests in a §1125(a) false-advertising suit, a plaintiff must allege an injury to a commercial interest in reputation or sales.  Pp. 10–13.

    (2) A statutory cause of action is also presumed to be limited to plaintiffs whose injuries are proximately caused by violations of the statute.  See, *e.g., Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 268–270.  This requirement generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct, such as when the harm is purely derivative of "misfortunes visited upon a third person by the defendant's acts."  *Id.,* at 268–269. In a sense, all commercial injuries from false advertising are derivative of those suffered by consumers deceived by the advertising.  But since the Lanham Act authorizes suit only for commercial injuries, the intervening consumer-deception step is not fatal to the proximate-cause showing the statute requires.  Cf. *Bridge* v. *Phoenix Bond*

Syllabus

*& Indemnity Co.*, 553 U. S. 639, 656. Thus, a plaintiff suing under §1125(a) ordinarily must show that its economic or reputational injury flows directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff. Pp. 13–15.

(3) Direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue under §1125(a). These principles provide better guidance than the multifactor balancing test urged by Lexmark, the direct-competitor test, or the reasonable-interest test applied by the Sixth Circuit. Pp. 15–18.

(c) Under these principles, Static Control comes within the class of plaintiffs authorized to sue under §1125(a). Its alleged injuries—lost sales and damage to its business reputation—fall within the zone of interests protected by the Act, and Static Control sufficiently alleged that its injuries were proximately caused by Lexmark's misrepresentations. Pp. 18–22.

697 F. 3d 387, affirmed.

SCALIA, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–873

_____

## LEXMARK INTERNATIONAL, INC., PETITIONER *v.* STATIC CONTROL COMPONENTS, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[March 25, 2014]

JUSTICE SCALIA delivered the opinion of the Court.

This case requires us to decide whether respondent, Static Control Components, Inc., may sue petitioner, Lexmark International, Inc., for false advertising under the Lanham Act, 15 U. S. C. §1125(a).

## I. Background

Lexmark manufactures and sells laser printers. It also sells toner cartridges for those printers (toner being the powdery ink that laser printers use to create images on paper). Lexmark designs its printers to work only with its own style of cartridges, and it therefore dominates the market for cartridges compatible with its printers. That market, however, is not devoid of competitors. Other businesses, called "remanufacturers," acquire used Lexmark toner cartridges, refurbish them, and sell them in competition with new and refurbished cartridges sold by Lexmark.

Lexmark would prefer that its customers return their empty cartridges to it for refurbishment and resale, rather than sell those cartridges to a remanufacturer. So Lexmark introduced what it called a "Prebate" program,

which enabled customers to purchase new toner cartridges at a 20-percent discount if they would agree to return the cartridge to Lexmark once it was empty. Those terms were communicated to consumers through notices printed on the toner-cartridge boxes, which advised the consumer that opening the box would indicate assent to the terms— a practice commonly known as "shrinkwrap licensing," see, *e.g., ProCD, Inc.* v. *Zeidenberg*, 86 F. 3d 1447, 1449 (CA7 1996). To enforce the Prebate terms, Lexmark included a microchip in each Prebate cartridge that would disable the cartridge after it ran out of toner; for the cartridge to be used again, the microchip would have to be replaced by Lexmark.

Static Control is not itself a manufacturer or remanufacturer of toner cartridges. It is, rather, "the market leader [in] making and selling the components necessary to remanufacture Lexmark cartridges." 697 F. 3d 387, 396 (CA6 2012) (case below). In addition to supplying remanufacturers with toner and various replacement parts, Static Control developed a microchip that could mimic the microchip in Lexmark's Prebate cartridges. By purchasing Static Control's microchips and using them to replace the Lexmark microchip, remanufacturers were able to refurbish and resell used Prebate cartridges.

Lexmark did not take kindly to that development. In 2002, it sued Static Control, alleging that Static Control's microchips violated both the Copyright Act of 1976, 17 U. S. C. §101 *et seq.*, and the Digital Millennium Copyright Act, 17 U. S. C. §1201 *et seq.* Static Control counterclaimed, alleging, among other things, violations of §43(a) of the Lanham Act, 60 Stat. 441, codified at 15 U. S. C. §1125(a). Section 1125(a) provides:

> "(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or

any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

"(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

"(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

"shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

Section 1125(a) thus creates two distinct bases of liability: false association, §1125(a)(1)(A), and false advertising, §1125(a)(1)(B). See *Waits* v. *Frito-Lay, Inc.*, 978 F. 2d 1093, 1108 (CA9 1992). Static Control alleged only false advertising.

As relevant to its Lanham Act claim, Static Control alleged two types of false or misleading conduct by Lexmark. First, it alleged that through its Prebate program Lexmark "purposefully misleads end-users" to believe that they are legally bound by the Prebate terms and are thus required to return the Prebate-labeled cartridge to Lexmark after a single use. App. 31, ¶39. Second, it alleged that upon introducing the Prebate program, Lexmark "sent letters to most of the companies in the toner cartridge remanufacturing business" falsely advising those companies that it was illegal to sell refurbished Prebate cartridges and, in particular, that it was illegal to use Static Control's products to refurbish those cartridges. *Id.,* at 29, ¶35. Static Control asserted that by those

statements, Lexmark had materially misrepresented "the
nature, characteristics, and qualities" of both its own
products and Static Control's products. *Id.,* at 43–44, ¶85.
It further maintained that Lexmark's misrepresentations
had "proximately caused and [we]re likely to cause injury
to [Static Control] by diverting sales from [Static Control]
to Lexmark," and had "substantially injured [its] business
reputation" by "leading consumers and others in the trade
to believe that [Static Control] is engaged in illegal con-
duct." *Id.,* at 44, ¶88.  Static Control sought treble dam-
ages, attorney's fees and costs, and injunctive relief.[1]

The District Court granted Lexmark's motion to dismiss
Static Control's Lanham Act claim.  It held that Static
Control lacked "prudential standing" to bring that claim,
App. to Pet. for Cert. 83, relying on a multifactor balanc-
ing test it attributed to *Associated Gen. Contractors of
Cal., Inc.* v. *Carpenters*, 459 U. S. 519 (1983).  The court
emphasized that there were "more direct plaintiffs in the
form of remanufacturers of Lexmark's cartridges"; that
Static Control's injury was "remot[e]" because it was a
mere "byproduct of the supposed manipulation of consum-
ers' relationships with remanufacturers"; and that
Lexmark's "alleged intent [was] to dry up spent cartridge
supplies at the remanufacturing level, rather than at
[Static Control]'s supply level, making remanufacturers
Lexmark's alleged intended target."  App. to Pet. for Cert.
83.

The Sixth Circuit reversed the dismissal of Static Con-
trol's Lanham Act claim.  697 F. 3d, at 423.  Taking the
lay of the land, it identified three competing approaches to

_____

[1] Lexmark contends that Static Control's allegations failed to describe
"commercial advertising or promotion" within the meaning of 15
U. S. C. §1125(a)(1)(B).  That question is not before us, and we express
no view on it.  We assume without deciding that the communica-
tions alleged by Static Control qualify as commercial advertising or
promotion.

determining whether a plaintiff has standing to sue under the Lanham Act. It observed that the Third, Fifth, Eighth, and Eleventh Circuits all refer to "antitrust standing or the [*Associated General Contractors*] factors in deciding Lanham Act standing," as the District Court had done. *Id.,* at 410 (citing *Conte Bros. Automotive, Inc.* v. *Quaker State-Slick 50, Inc.*, 165 F. 3d 221, 233–234 (CA3 1998); *Procter & Gamble Co.* v. *Amway Corp.*, 242 F. 3d 539, 562–563 (CA5 2001); *Gilbert/Robinson, Inc.* v. *Carrie Beverage-Missouri, Inc.*, 989 F. 2d 985, 990–991 (CA8 1993); *Phoenix of Broward, Inc.* v. *McDonald's Corp.*, 489 F. 3d 1156, 1162–1164 (CA11 2007)). By contrast, "[t]he Seventh, Ninth, and Tenth [Circuits] use a categorical test, permitting Lanham Act suits only by an actual competitor." 697 F. 3d, at 410 (citing *L. S. Heath & Son, Inc.* v. *AT&T Information Systems, Inc.*, 9 F. 3d 561, 575 (CA7 1993); *Waits*, *supra,* at 1108–1109; *Stanfield* v. *Osborne Industries, Inc.*, 52 F. 3d 867, 873 (CA10 1995)). And the Second Circuit applies a "'reasonable interest' approach," under which a Lanham Act plaintiff "has standing if the claimant can demonstrate '(1) a reasonable interest to be protected against the alleged false advertising and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising.'" 697 F. 3d, at 410 (quoting *Famous Horse, Inc.* v. *5th Avenue Photo Inc.*, 624 F. 3d 106, 113 (CA2 2010)). The Sixth Circuit applied the Second Circuit's reasonable-interest test and concluded that Static Control had standing because it "alleged a cognizable interest in its business reputation and sales to remanufacturers and sufficiently alleged that th[o]se interests were harmed by Lexmark's statements to the remanufacturers that Static Control was engaging in illegal conduct." 697 F. 3d, at 411.

We granted certiorari to decide "the appropriate analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham

Act."  Pet. for Cert. i; 569 U. S. ____ (2013).[2]

## II. "Prudential Standing"

The parties' briefs treat the question on which we granted certiorari as one of "prudential standing."  Because we think that label misleading, we begin by clarifying the nature of the question at issue in this case.

From Article III's limitation of the judicial power to resolving "Cases" and "Controversies," and the separation-of-powers principles underlying that limitation, we have deduced a set of requirements that together make up the "irreducible constitutional minimum of standing." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992).  The plaintiff must have suffered or be imminently threatened with a concrete and particularized "injury in fact" that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision. *Ibid.*  Lexmark does not deny that Static Control's allegations of lost sales and damage to its business reputation give it standing under Article III to press its false-advertising claim, and we are satisfied that they do.

Although Static Control's claim thus presents a case or controversy that is properly within federal courts' Article III jurisdiction, Lexmark urges that we should decline to adjudicate Static Control's claim on grounds that are "prudential," rather than constitutional.  That request is in some tension with our recent reaffirmation of the principle that "a federal court's 'obligation' to hear and decide" cases within its jurisdiction "is 'virtually unflagging.'" *Sprint Communications, Inc.* v. *Jacobs*, 571 U. S. ___, ___ (2013) (slip op., at 6) (quoting *Colorado River Water Con-*

———————

[2] Other aspects of the parties' sprawling litigation, including Lexmark's claims under federal copyright and patent law and Static Control's claims under federal antitrust and North Carolina unfair-competition law, are not before us.  Our review pertains only to Static Control's Lanham Act claim.

*servation Dist.* v. *United States*, 424 U. S. 800, 817 (1976)). In recent decades, however, we have adverted to a "prudential" branch of standing, a doctrine not derived from Article III and "not exhaustively defined" but encompassing (we have said) at least three broad principles: "'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 12 (2004) (quoting *Allen* v. *Wright*, 468 U. S. 737, 751 (1984)).

Lexmark bases its "prudential standing" arguments chiefly on *Associated General Contractors*, but we did not describe our analysis in that case in those terms. Rather, we sought to "ascertain," as a matter of statutory interpretation, the "scope of the private remedy created by" Congress in §4 of the Clayton Act, and the "class of persons who [could] maintain a private damages action under" that legislatively conferred cause of action. 459 U. S., at 529, 532. We held that the statute limited the class to plaintiffs whose injuries were proximately caused by a defendant's antitrust violations. *Id.,* at 532–533. Later decisions confirm that *Associated General Contractors* rested on statutory, not "prudential," considerations. See, *e.g., Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 265–268 (1992) (relying on *Associated General Contractors* in finding a proximate-cause requirement in the cause of action created by the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §1964(c)); *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 456 (2006) (affirming that *Holmes* "relied on a careful interpretation of §1964(c)"). Lexmark's arguments thus do not deserve the "prudential" label.

Static Control, on the other hand, argues that we should

measure its "prudential standing" by using the zone-of-interests test. Although we admittedly have placed that test under the "prudential" rubric in the past, see, *e.g., Elk Grove*, *supra,* at 12, it does not belong there any more than *Associated General Contractors* does. Whether a plaintiff comes within "the 'zone of interests'" is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 97, and n. 2 (1998); *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 394–395 (1987); *Holmes*, *supra,* at 288 (SCALIA, J., concurring in judgment). As Judge Silberman of the D. C. Circuit recently observed, "'prudential standing' is a misnomer" as applied to the zone-of-interests analysis, which asks whether "this particular class of persons ha[s] a right to sue under this substantive statute." *Association of Battery Recyclers, Inc.* v. *EPA*, 716 F. 3d 667, 675–676 (2013) (concurring opinion).[3]

---

[3] The zone-of-interests test is not the only concept that we have previously classified as an aspect of "prudential standing" but for which, upon closer inspection, we have found that label inapt. Take, for example, our reluctance to entertain generalized grievances—*i.e.,* suits "claiming only harm to [the plaintiff's] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 573–574 (1992). While we have at times grounded our reluctance to entertain such suits in the "counsels of prudence" (albeit counsels "close[ly] relat[ed] to the policies reflected in" Article III), *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 475 (1982), we have since held that such suits do not present constitutional "cases" or "controversies." See, *e.g., Lance* v. *Coffman*, 549 U. S. 437, 439 (2007) (*per curiam*); *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 344–346 (2006); *Defenders of Wildlife*, *supra,* at 573–574. They are barred for constitutional reasons, not "prudential" ones. The limitations on third-party standing are harder to classify; we have observed that third-party standing is "'closely related to the question

Opinion of the Court

In sum, the question this case presents is whether Static Control falls within the class of plaintiffs whom Congress has authorized to sue under §1125(a).  In other words, we ask whether Static Control has a cause of action under the statute.[4]  That question requires us to determine the meaning of the congressionally enacted provision creating a cause of action.  In doing so, we apply traditional principles of statutory interpretation.  We do not ask whether in our judgment Congress *should* have authorized Static Control's suit, but whether Congress in fact did so.  Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, see *Alexander* v. *Sandoval*, 532 U. S. 275, 286–287 (2001), it cannot limit a cause of action that Congress has created merely because "prudence" dictates.

———————

whether a person in the litigant's position will have a right of action on the claim,'" *Department of Labor* v. *Triplett*, 494 U. S. 715, 721, n. ** (1990) (quoting *Warth* v. *Seldin*, 422 U. S. 490, 500, n. 12 (1975)), but most of our cases have not framed the inquiry in that way. See, *e.g., Kowalski* v. *Tesmer*, 543 U. S. 125, 128–129 (2004) (suggesting it is an element of "prudential standing").  This case does not present any issue of third-party standing, and consideration of that doctrine's proper place in the standing firmament can await another day.

[4] We have on occasion referred to this inquiry as "statutory standing" and treated it as effectively jurisdictional.  See, *e.g., Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 97, and n. 2 (1998); cases cited *id.,* at 114–117 (Stevens, J., concurring in judgment).  That label is an improvement over the language of "prudential standing," since it correctly places the focus on the statute.  But it, too, is misleading, since "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case.'" *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 642–643 (2002) (quoting *Steel Co., supra,* at 89); see also *Grocery Mfrs. Assn.* v. *EPA*, 693 F. 3d 169, 183–185 (CADC 2012) (Kavanaugh, J., dissenting), and cases cited therein; Pathak, Statutory Standing and the Tyranny of Labels, 62 Okla. L. Rev. 89, 106 (2009).

### III. Static Control's Right To Sue Under §1125(a)

Thus, this case presents a straightforward question of statutory interpretation: Does the cause of action in §1125(a) extend to plaintiffs like Static Control?   The statute authorizes suit by "any person who believes that he or she is likely to be damaged" by a defendant's false advertising.  §1125(a)(1).  Read literally, that broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article III. No party makes that argument, however, and the "unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that [§1125(a)] should not get such an expansive reading." *Holmes*, 503 U. S., at 266 (footnote omitted).  We reach that conclusion in light of two relevant background principles already mentioned: zone of interests and proximate causality.

### A. Zone of Interests

First, we presume that a statutory cause of action extends only to plaintiffs whose interests "fall within the zone of interests protected by the law invoked." *Allen*, 468 U. S., at 751.  The modern "zone of interests" formulation originated in *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150 (1970), as a limitation on the cause of action for judicial review conferred by the Administrative Procedure Act (APA).   We have since made clear, however, that it applies to all statutorily created causes of action; that it is a "requirement of general application"; and that Congress is presumed to "legislat[e] against the background of" the zone-of-interests limitation, "which applies unless it is expressly negated." *Bennett* v. *Spear*, 520 U. S. 154, 163 (1997); see also *Holmes*, *supra,* at 287–288 (SCALIA, J., concurring in judgment).  It is "perhaps more accurat[e]," though not very different as a practical matter, to say that the limitation *always* applies and is never negated, but that our

analysis of certain statutes will show that they protect a more-than-usually "expan[sive]" range of interests. *Bennett, supra,* at 164. The zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action in §1125(a).[5]

We have said, in the APA context, that the test is not "'especially demanding,'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U. S. ___, ___ (2012) (slip op., at 15). In that context we have often "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," and have said that the test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that'" Congress authorized that plaintiff to sue. *Id.,* at ___ (slip op., at 15–16). That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review. "We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under

————————

[5]Although we announced the modern zone-of-interests test in 1971, its roots lie in the common-law rule that a plaintiff may not recover under the law of negligence for injuries caused by violation of a statute unless the statute "is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §36, pp. 229–230 (5th ed. 1984); see cases cited *id.,* at 222–227; *Gorris* v. *Scott,* [1874] 9 L. R. Exch. 125 (Eng.). Statutory causes of action are regularly interpreted to incorporate standard common-law limitations on civil liability—the zone-of-interests test no less than the requirement of proximate causation, see Part III–B, *infra.*

the '"generous review provisions"' of the APA may not do so for other purposes." *Bennett*, *supra,* at 163 (quoting *Clarke*, 479 U. S., at 400, n. 16, in turn quoting *Data Processing*, *supra,* at 156).

Identifying the interests protected by the Lanham Act, however, requires no guesswork, since the Act includes an "unusual, and extraordinarily helpful," detailed statement of the statute's purposes. *H. B. Halicki Productions* v. *United Artists Communications, Inc.*, 812 F. 2d 1213, 1214 (CA9 1987). Section 45 of the Act, codified at 15 U. S. C. §1127, provides:

> "The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations."

Most of the enumerated purposes are relevant to false-association cases; a typical false-advertising case will implicate only the Act's goal of "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition." Although "unfair competition" was a "plastic" concept at common law, *Ely-Norris Safe Co.* v. *Mosler Safe Co.*, 7 F. 2d 603, 604 (CA2 1925) (L. Hand, J.), it was understood to be concerned with injuries to business reputation and present and future sales. See Rogers, Book Review, 39 Yale L. J. 297, 299

(1929); see generally 3 Restatement of Torts, ch. 35, Introductory Note, pp. 536–537 (1938).

We thus hold that to come within the zone of interests in a suit for false advertising under §1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales. A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act—a conclusion reached by every Circuit to consider the question. See *Colligan* v. *Activities Club of N. Y., Ltd.*, 442 F. 2d 686, 691–692 (CA2 1971); *Serbin* v. *Ziebart Int'l Corp.*, 11 F. 3d 1163, 1177 (CA3 1993); *Made in the USA Foundation* v. *Phillips Foods, Inc.*, 365 F. 3d 278, 281 (CA4 2004); *Procter & Gamble Co.*, 242 F. 3d, at 563–564; *Barrus* v. *Sylvania*, 55 F. 3d 468, 470 (CA9 1995); *Phoenix of Broward*, 489 F. 3d, at 1170. Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis.

## B. Proximate Cause

Second, we generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute. For centuries, it has been "a well established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause." *Waters* v. *Merchants' Louisville Ins. Co.*, 11 Pet. 213, 223 (1837); see *Holmes*, 503 U. S., at 287 (SCALIA, J., concurring in judgment). That venerable principle reflects the reality that "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Associated Gen. Contractors*, 459 U. S., at 536. Congress, we assume, is familiar with the common-law rule and does not mean to displace it *sub silentio*. We have thus construed federal causes of action in a variety of contexts to

incorporate a requirement of proximate causation. See, *e.g., Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 346 (2005) (securities fraud); *Holmes, supra,* at 268–270 (RICO); *Associated Gen. Contractors, supra,* at 529–535 (Clayton Act). No party disputes that it is proper to read §1125(a) as containing such a requirement, its broad language notwithstanding.

The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so. See *Exxon Co., U. S. A.* v. *Sofec, Inc.*, 517 U. S. 830, 838–839 (1996); *Pacific Operators Offshore, LLP* v. *Valladolid*, 565 U. S. \_\_\_, \_\_\_ (2012) (SCALIA, J., concurring in part and concurring in judgment) (slip op., at 3). Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.

Put differently, the proximate-cause requirement generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct. That is ordinarily the case if the harm is purely derivative of "misfortunes visited upon a third person by the defendant's acts." *Holmes, supra,* at 268–269; see, *e.g., Hemi Group, LLC* v. *City of New York*, 559 U. S. 1, 10–11 (2010). In a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute. See *Harold H. Huggins Realty, Inc.* v. *FNC, Inc.*, 634 F. 3d 787, 800–801 (CA5 2011). That is consistent with our recognition that under common-law principles, a plaintiff can be directly injured by a misrepresentation even where "a third party, and not

the plaintiff, . . . relied on" it. *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. 639, 656 (2008).

We thus hold that a plaintiff suing under §1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff. That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff. For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's "inability to meet [its] financial obligations." *Anza*, 547 U. S., at 458.[6]

## C. Proposed Tests

At oral argument, Lexmark agreed that the zone of interests and proximate causation supply the relevant background limitations on suit under §1125(a). See Tr. of Oral Arg. 4–5, 11–12, 17–18. But it urges us to adopt, as the optimal formulation of those principles, a multifactor balancing test derived from *Associated General Contrac-*

---

[6] Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct. Like the zone-of-interests test, see *supra,* at 8–9, and nn. 3–4, it is an element of the cause of action under the statute, and so is subject to the rule that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Steel Co.*, 523 U. S., at 89. But like any other element of a cause of action, it must be adequately alleged at the pleading stage in order for the case to proceed. See *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678–679 (2009). If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed; if they are sufficient, then the plaintiff is entitled to an opportunity to prove them.

*tors*. In the alternative, it asks that we adopt a categorical test permitting only direct competitors to sue for false advertising. And although neither party urges adoption of the "reasonable interest" test applied below, several *amici* do so. While none of those tests is wholly without merit, we decline to adopt any of them. We hold instead that a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue.

The balancing test Lexmark advocates was first articulated by the Third Circuit in *Conte Bros.* and later adopted by several other Circuits. *Conte Bros.* identified five relevant considerations:

> "(1) The nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]?
>
> "(2) The directness or indirectness of the asserted injury.
>
> "(3) The proximity or remoteness of the party to the alleged injurious conduct.
>
> "(4) The speculativeness of the damages claim.
>
> "(5) The risk of duplicative damages or complexity in apportioning damages." 165 F. 3d, at 233 (citations and internal quotation marks omitted).

This approach reflects a commendable effort to give content to an otherwise nebulous inquiry, but we think it slightly off the mark. The first factor can be read as requiring that the plaintiff's injury be within the relevant zone of interests and the second and third as requiring (somewhat redundantly) proximate causation; but it is not correct to treat those requirements, which must be met in every case, as mere factors to be weighed in a balance. And the fourth and fifth factors are themselves problematic. "[T]he difficulty that can arise when a court attempts

to ascertain the damages caused by some remote action" is a "motivating principle" behind the proximate-cause requirement, *Anza, supra,* at 457–458; but potential difficulty in ascertaining and apportioning damages is not, as *Conte Bros.* might suggest, an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects. Even when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief under §1116(a) (assuming it can prove a likelihood of future injury) or disgorgement of the defendant's ill-gotten profits under §1117(a). See *TrafficSchool.com, Inc.* v. *Edriver Inc.*, 653 F. 3d 820, 831 (CA9 2011); *Johnson & Johnson* v. *Carter-Wallace, Inc.*, 631 F. 2d 186, 190 (CA2 1980). Finally, experience has shown that the *Conte Bros.* approach, like other open-ended balancing tests, can yield unpredictable and at times arbitrary results. See, *e.g.,* Tushnet, Running the Gamut from A to B: Federal Trademark and False Advertising Law, 159 U. Pa. L. Rev. 1305, 1376–1379 (2011).

In contrast to the multifactor balancing approach, the direct-competitor test provides a bright-line rule; but it does so at the expense of distorting the statutory language. To be sure, a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation. But a rule categorically prohibiting all suits by noncompetitors would read too much into the Act's reference to "unfair competition" in §1127. By the time the Lanham Act was adopted, the common-law tort of unfair competition was understood not to be limited to actions between competitors. One leading authority in the field wrote that "there need be no competition in unfair competition," just as "[t]here is no soda in soda water, no grapes in grape fruit, no bread in bread fruit, and a clothes horse is not a horse but is good enough to hang things

on."   Rogers, 39 Yale L. J., at 299; accord, *Vogue Co.* v. *Thompson-Hudson Co.*, 300 F. 509, 512 (CA6 1924); 1 H. Nims, The Law of Unfair Competition and Trade-Marks, p. vi (4th ed. 1947); 2 *id.,* at 1194–1205.   It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors.

Finally, there is the "reasonable interest" test applied by the Sixth Circuit in this case.   As typically formulated, it requires a commercial plaintiff to "demonstrate '(1) a reasonable interest to be protected against the alleged false advertising and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising.'"   697 F. 3d, at 410 (quoting *Famous Horse*, 624 F. 3d, at 113).   A purely practical objection to the test is that it lends itself to widely divergent application.   Indeed, its vague language can be understood as requiring only the bare minimum of Article III standing. The popularity of the multifactor balancing test reflects its appeal to courts tired of "grappl[ing] with defining" the "'reasonable interest'" test "with greater precision." *Conte Bros.*, 165 F. 3d, at 231.   The theoretical difficulties with the test are even more substantial: The relevant question is not whether the plaintiff's interest is "reasonable," but whether it is one the Lanham Act protects; and not whether there is a "reasonable basis" for the plaintiff's claim of harm, but whether the harm alleged is proximately tied to the defendant's conduct.   In short, we think the principles set forth above will provide clearer and more accurate guidance than the "reasonable interest" test.

## IV. Application

Applying those principles to Static Control's false-advertising claim, we conclude that Static Control comes within the class of plaintiffs whom Congress authorized to sue under §1125(a).

To begin, Static Control's alleged injuries—lost sales and damage to its business reputation—are injuries to precisely the sorts of commercial interests the Act protects. Static Control is suing not as a deceived consumer, but as a "perso[n] engaged in" "commerce within the control of Congress" whose position in the marketplace has been damaged by Lexmark's false advertising. §1127. There is no doubt that it is within the zone of interests protected by the statute.

Static Control also sufficiently alleged that its injuries were proximately caused by Lexmark's misrepresentations. This case, it is true, does not present the "classic Lanham Act false-advertising claim" in which "'one competito[r] directly injur[es] another by making false statements about his own goods [or the competitor's goods] and thus inducing customers to switch.'" *Harold H. Huggins Realty*, 634 F. 3d, at 799, n. 24. But although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under §1125(a). For at least two reasons, Static Control's allegations satisfy the requirement of proximate causation.

First, Static Control alleged that Lexmark disparaged its business and products by asserting that Static Control's business was illegal. See 697 F. 3d, at 411, n. 10 (noting allegation that Lexmark "directly target[ed] Static Control" when it "falsely advertised that Static Control infringed Lexmark's patents"). When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements. Courts have therefore afforded relief under §1125(a) not only where a defendant denigrates a plaintiff's product by name, see, *e.g., McNeilab, Inc.* v. *American Home Prods. Corp.*, 848 F. 2d 34, 38 (CA2 1988), but also where the defendant damages the product's reputation by, for example, equat-

ing it with an inferior product, see, *e.g., Camel Hair and Cashmere Inst. of Am., Inc.* v. *Associated Dry Goods Corp.*, 799 F. 2d 6, 7–8, 11–12 (CA1 1986); *PPX Enterprises, Inc.* v. *Audiofidelity, Inc.*, 746 F. 2d 120, 122, 125 (CA2 1984). Traditional proximate-causation principles support those results: As we have observed, a defendant who "'seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product'" may be said to have proximately caused the plaintiff's harm. *Bridge*, 553 U. S., at 657 (quoting Restatement (Second) of Torts §870, Comment *h* (1977); emphasis added in *Bridge*).

The District Court emphasized that Lexmark and Static Control are not direct competitors. But when a party claims reputational injury from disparagement, competition is not required for proximate cause; and that is true even if the defendant's aim was to harm its immediate competitors, and the plaintiff merely suffered collateral damage. Consider two rival carmakers who purchase airbags for their cars from different third-party manufacturers. If the first carmaker, hoping to divert sales from the second, falsely proclaims that the airbags used by the second carmaker are defective, both the second carmaker and its airbag supplier may suffer reputational injury, and their sales may decline as a result. In those circumstances, there is no reason to regard either party's injury as derivative of the other's; each is directly and independently harmed by the attack on its merchandise.

In addition, Static Control adequately alleged proximate causation by alleging that it designed, manufactured, and sold microchips that both (1) were necessary for, and (2) had no other use than, refurbishing Lexmark toner cartridges. See App. 13, ¶31; *id.,* at 37, ¶54.[7] It follows

---

[7] We understand this to be the thrust of both sides' allegations concerning Static Control's design and sale of specialized microchips for the specific purpose of enabling the remanufacture of Lexmark's

from that allegation that any false advertising that re-
duced the remanufacturers' business necessarily injured
Static Control as well. Taking Static Control's assertions
at face value, there is likely to be something very close to a
1:1 relationship between the number of refurbished Pre-
bate cartridges sold (or not sold) by the remanufacturers
and the number of Prebate microchips sold (or not sold) by
Static Control. "Where the injury alleged is so integral an
aspect of the [violation] alleged, there can be no question"
that proximate cause is satisfied. *Blue Shield of Va.* v.
*McCready*, 457 U. S. 465, 479 (1982).

To be sure, on this view, the causal chain linking Static
Control's injuries to consumer confusion is not direct, but
includes the intervening link of injury to the remanufac-
turers. Static Control's allegations therefore might not
support standing under a strict application of the """gen-
eral tendency"'" not to stretch proximate causation """be-
yond the first step."'" *Holmes*, 503 U. S., at 271. But the
reason for that general tendency is that there ordinarily is
a "discontinuity" between the injury to the direct victim
and the injury to the indirect victim, so that the latter
is not surely attributable to the former (and thus also to
the defendant's conduct), but might instead have resulted
from "any number of [other] reasons." *Anza*, 547 U. S., at
458–459. That is not the case here. Static Control's alle-
gations suggest that if the remanufacturers sold 10,000
fewer refurbished cartridges because of Lexmark's false
advertising, then it would follow more or less automatically
that Static Control sold 10,000 fewer microchips for the
same reason, without the need for any "speculative . . .
proceedings" or "intricate, uncertain inquiries." *Id.,* at
459–460. In these relatively unique circumstances, the
remanufacturers are not "more immediate victim[s]" than
Static Control. *Bridge, supra,* at 658.

———————

Prebate cartridges.

Although we conclude that Static Control has *alleged* an adequate basis to proceed under §1125(a), it cannot obtain relief without *evidence* of injury proximately caused by Lexmark's alleged misrepresentations.  We hold only that Static Control is entitled to a chance to prove its case.

*          *          *

To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's mis-representations.  Static Control has adequately pleaded both elements.  The judgment of the Court of Appeals is affirmed.

*It is so ordered.*